# 𝔚𝔶𝔱𝔥𝔢𝔳𝔦𝔩𝔩𝔢.

## MERCHANTS BANK OF BALTIMORE AND ALS. V. GODDIN & HOWISON, TRUSTEES, AND ALS.

### July 13, 1882.

MANUFACTURING CORPORATION—*Trust deeds to secure loans—Case at bar.*— In 1867, the U M Co. obtained an act authorizing it to borrow not exceeding $30,000, without regard to rate per cent. prescribed by law or to V. C. 1860, ch. 57, § 34. Then the Co. executed coupon bonds of $500 each, sixty in number; and to secure them executed a trust deed, signed by the president, and having the corporate seal affixed by the secretary and duly acknowledged, conveying to G & H, trustees, real estate and machinery. It was conditioned for the sale of the trust property on default in the payment of any of the bonds which were executed *and issued* by the U M Co. Of these sixty bonds thirty-one were pur- chased by the S B of T, and nine by A P H. The other twenty were never issued. In 1869, the U M Co., desiring to sell the machinery, induced the S B of T and A P H to release it, on assurance that the said twenty bonds had not been and would not be negotiated. The re- lease, however, was executed not only by the S B of T and A P H, but also by K, the president of the U M Co., who signed "as holder of twenty bonds of $500 each as collateral for the payment of the float- ing debt of the U M Co." In 1879, the trustees being required, sold the trust property to F for $13,500. F excepted to the title, urging, among other objections, that the trust-deed had not been properly exe- cuted; that it infringed vested rights of the creditors of the U M Co. in giving preference; that the claim of the holders of the floating debts of the U M Co. to the twenty bonds, should be settled. Thereupon, the trustees brought their bill to determine all questions. The S B of T, A P H, and the U M Co. answered. W and the M B of B came in by peti- tion claiming benefit of the twenty bonds held as collateral for payment of the floating debts, whereof they held large parts. The cause having been referred, the commissioner directed to ascertain the names, amounts, and priorities of the creditors of the U M Co. entitled to participate in the sale money, reported adversely to W and the M B of B, representa- tives of the floating debts. They excepted to the report. Court below overruled the exception. Exceptors appealed.

HELD:

1. A deed of a corporation executed by the president under the seal of the corporation, is a valid mode of executing the deed of trust in this case.

2. The act authorizing the U M Co. to borrow money as it did, was a valid and constitutional act.

3. Independently of that act, the lien created by the trust deed was valid, securing contemporaneous loans and giving no preference among existing creditors within the meaning of V. C. 1860, ch. 57, § 34.

4. That the S B of T and A P H, holders of the only bonds that were duly executed and issued by the U M Co., and which have the security of the trust deed, are entitled to the entire sale money fund.

5. That K's executing the release as he did, was neither proof of an existing trust in favor of the holders of the floating debt, nor the creation of such trust, but unauthorized, inconsistent with the conditions of the release by the S B of T and A P H, and inoperative.

Appeal from decrees of the chancery court of Richmond city, rendered 5th July and 4th December, 1879, in the suit of Wellington Goddin and R. R. Howison, trustees, against Samuel Freedley; The Union Manufacturing Company of Richmond, Va.; The City Savings Bank of Richmond; John W. Wright, receiver of said bank; The Savings Bank of Tolland, Tolland county, Connecticut, and Alvan P. Hyde, of Hartford, Connecticut.

The said U. M. Co., in January, 1867, under a special act of assembly, executed its deed of trust conveying real estate and machinery to Goddin and Howison, in trust, to secure the payment of sixty coupon bonds, each for $500, payable 1st January, 1872, with semi-annual interest at eight per cent. per annum. Thirty-one of these bonds were issued and sold to the Savings Bank of Tolland, and nine more to Alvin P. Hyde. The remaining twenty were never issued, in fact, were never sealed. In 1869 the company desired to sell the machinery and get a release thereof from the holders of the thirty-one and the nine bonds. Without the knowledge of the holders, James L. Kent,

then the president of said company, who had assured them that the said twenty bonds had not been and would never be negotiated, also executed the release, signing it as the "holder of the said twenty bonds as collateral for the payment of the floating debt of the said company."

In 1879 the trustees sold the remaining trust property to Samuel Freedley. He afterwards making objections to the title, the trustees brought suit to remove the difficulties. The Savings Bank of Tolland, the U. M. Company and A. P. Hyde filed their answers, all concurring in the positions of the trustees, that the trust deed was valid, and was only to secure the forty bonds that were actually issued, and that the sale money belonged entirely to the holders thereof. But John W. Wright, receiver of the City Savings Bank, and the Merchants Bank of Baltimore, having been made parties on their own petitions, claimed that the said twenty bonds "held as collateral for the payment of the floating debt of the company," were entitled to ratable satisfaction out of that sale money, and that they were holders of large portions of that floating debt.

The facts and the proceedings are fully indicated in the *syllabus* and stated in the opinion of the court, and need not be reiterated.

The decision of the said chancery court being adverse to the said Wright and Merchants Bank of Baltimore, from its decrees they obtained an appeal to this court. This cause was heard at Richmond, but was decided at Wytheville.

*Bryan, Donnan & Hamilton* and *Ould & Carrington*, for the appellants.

*W. W. Henry*, for appellees.

ANDERSON, J., delivered the opinion of the court.

The deed of trust was executed by James L. Kent, president, under the corporate seal of the Union Manufacturing Company, Richmond, Va., and by W. Goddin and R. R. Howison, trustees, under their hands and seals. A deed of a corporation, executed by the president under the seal of the corporation, is a valid mode of executing it. Angel and Ames on Corporations, § 226; *Haven* v. *Adams*, 4 Allen, 80; *Burr* v. *McDonald*, 3 Gratt. 234.

The corporation, at a meeting of the stockholders, authorized the officers of the company to execute the deed, under the direction of the executive committee. That was sufficient authority to the president to execute the deed under the direction of said committee, it being an act which in its performance properly belonged to the function of the president, and evidently was all that was contemplated by the resolution of the company. The deed was evidently executed under the direction of the executive committee, and with its sanction and approval, and was ever afterward recognized by the company as its deed, and the appellants claim under it.

The deed was made "to secure the payment of the money borrowed by the said Union Manufacturing Company, according to the act of assembly (under which authority the company was acting), not exceeding the sum of $30,000, and all interest that may accrue and be payable thereon." The deed goes on to recite that the company had executed bonds of $500 each, bearing date February 28th, 1867, payable on the 1st of January, 1872, with interest from date, at the rate of eight per centum per annum, payable semi-annually, on the 1st of July and 1st of January of each year, for which coupons are attached. If the deed had recited that such bonds had been executed to the amount of $30,000, principal (though I do not find it stated to what amount they had been executed), unless they had been afterwards issued and *delivered* by the company, the deed could not be

construed as a security for any that had not been issued. For the deed expressly provides for sale of the property only in case of default made in the payment of bonds and interest which had been "executed and *issued*" by the company. The mortgage was not made to secure thirty thousand dollars of bonds whether they were negotiated or not. All were not equally secured, but only such as were, or should be, negotiated and issued by the company for the money borrowed. The deed expressly declares that the property was conveyed to the trustees, " in trust to secure the payment of the money borrowed, and to be borrowed," "not *exceeding* thirty thousand dollars." And it only provides that the coupons shall be payable on presentation and delivery at the office of the said company. Bonds that had not been issued and delivered created no liability in the company, and to say that the coupons should be presentable and payable at the office of the company in such case, would be absurd.

Twenty thousand dollars of the bonds were properly executed, issued and delivered to the Savings Bank of Tolland and Alvin P. Hyde, and they were undoubtedly the *bona fide* holders and owners of those bonds. And they say, that the execution of the remaining twenty bonds, amounting to ten thousand dollars, was never completed, and consequently that no part of the property conveyed by the deed of trust is applicable to the payment of those bonds. They say, that about the last of October, 1869, James L. Kent, who was then president of the said Union Manufacturing Company, applied to them to consent to the release of the machinery and fixtures embraced in the deed of trust, and represented to them that the said company had determined to cease their business of manufacturing, and were about to lease their premises, embraced in said trust deed; that the company could sell the machinery to the lessees at a good price; that none of said coupons had been sold or

otherwise disposed of except the $20,000 held by them; and if they would consent to the release of said machinery and fixtures, said company would agree not to issue, or in any way dispose of, the remaining $10,000 of bonds, and that the said trust deed should thereafter remain as security for the payment of the $20,000 of bonds so held by them, and for those only. That in view of the wear and tear, and rapid depreciation in value of the machinery, the real estate would be a safer security for the $20,000 of bonds, then outstanding, than the real estate and machinery would be for the whole $30,000 of bonds, and unless this arrangement was made the company would issue and dispose of the remaining $10,000 of said bonds. And they finally consented to said release, relying on the said promise and representations of said Kent.

The release was made by the trustees with their consent, and in support of the foregoing affirmative statements in their answers to the plaintiff's bill, they offered in evidence the depositions of C. A. Hawkins, who was treasurer of said savings bank, and Alvin P. Hyde, who was one of the defendants, whose testimony was excepted to by the appellants upon the ground of incompetency, James L. Kent being dead.

We are of opinion that C. A. Hawkins not being a party to the transaction, nor a party to this suit, but only an agent of the savings bank, and not appearing to have any interest in the result of the suit, would have been a competent witness at common law, and that he is not rendered incompetent by the statute.

His testimony fully sustains the affirmative averments of the answers. He testifies that " when James L. Kent requested the Savings Bank of Tolland to consent to the release of the machinery, tools and fixtures, on condition that the company would not issue the remaining $10,000 of bonds, named in the mortgage, the bank objected because

they understood that the price to be received by the Union Manufacturing Company for such machinery, tools and fixtures, would amount to much more than the $10,000 of bonds to be cancelled. The price to be received, as we understood, was about $20,000; and the bank claimed that the excess over ten thousand dollars of the bonds to be cancelled, should be applied in part payment of the $20,000 of bonds already issued, and so reduce the mortgage. Mr. Kent insisted that the real estate was ample security for the $20,000 outstanding, and that the Union Manufacturing Company wished to retain the whole purchase money arising from the sale of the machinery, to enable them to close up their business. The arrangement was finally effected by Mr. James L. Kent and Alvin P. Hyde, giving a guaranty to the bank, that $10,500 of their bonds should be paid in full."

The said savings bank and Alvin P. Hyde afterwards gave their written consent to the release of the machinery, &c. As appears from a paper exhibited with the bill, and addressed to Wellington Goddin and R. R. Howison, trustees under a deed from the Union Manufacturing Company, Richmond, Virginia, bearing date, &c., in the following words:

"We, the undersigned, holders and owners of the bonds in the said deed of trust, secured and intended to be secured, hereby authorize and request you to release to the said Union Manufacturing Company and its assignee, the machinery, tools, and fixtures in said deed conveyed and contemplated."

This paper is signed—"The Savings Bank of Tolland, by Charles A. Hawkins, treasurer, holding 31 bonds of $500 each, numbering 1 to 31 inclusive," and is dated "Oct. 27th, 1869."

It is also signed—"Alvin P. Hyde, holding nine bonds of $500 each, numbered 32 to 40 inclusive, Hartford, Conn."

It is also signed—"James L. Kent, holding twenty bonds of $500 each, numbering 41 to 60 inclusive, as collateral for the payment of the floating debt of the company."

The Savings Bank of Tolland, in its answer, and the answer of Hyde is to the same effect, says that on or about the 5th of November, 1869, the said Hyde came to the banking house of this respondent in Tolland; that the undersigned, Charles A. Hawkins, then was and still is treasurer of said bank; that the said Hyde and said Hawkins went before Joseph Bishop, Esq., a justice of the peace, and signed and acknowledged the paper set forth in exhibit A in said bill; that immediately after signing said paper, said Hawkins and Hyde left the office of said Bishop, leaving said paper with said Bishop to be completed and delivered to said Kent.

Both Hawkins and Hyde aver that they never knew, or heard that said Kent proposed to sign, or had signed, said request claiming to hold any of said bonds as collateral for the floating debt of the company, until since the sale of said property to Freedley. But on the contrary, when said request was signed by them, it is averred by both of them, that it was distinctly understood and agreed that said $10,000 of the bonds remained the property of the company, and would not thereafter be issued or disposed of. And they deny, upon information and belief, that the company ever transferred said bonds to Kent, or authorized him to hold them as collateral for the floating debt. The foregoing averments are proved by the deposition of Charles A. Hawkins.

The signing of Kent was not necessary to the completeness of the instrument. It was complete in itself, after being signed by the bank and Hyde. There is nothing in the body of the instrument importing that any other signature was necessary to its completeness. It purports to be a request of the holders and owners of the bonds which

were secured, or intended to be secured, by the deed of trust; and the assurance having been, as they allege, that the $20,000 of bonds which they held were all that were issued, and that the remaining $10,000 would not be issued, if they consented to the release; and they having signed the paper on that condition, it would not have been contemplated by them that any signature besides theirs would be required, and that the instrument when signed by them and their acknowledgments were certified by the justice, and delivered to Mr. Kent, it would be complete; so that their statements are consistent throughout.

But Mr. Kent deemed it necessary, undoubtedly, that, although the remaining $10,000 of bonds had not been issued or disposed of, as the company had the right to issue them, and by resolution of the executive committee he was authorized to dispose of them as he deemed expedient, that consent should be given to the release by some one representing those bonds, in order to indemnify the trustees making the release; and as he, as president, had the custody of the bonds, and the power to complete their execution, and to dispose of them, which he construed as an authority to pledge them for the payment of the floating debt of the company, it was competent for him to consent to the release of the machinery, &c., so far as those bonds were concerned.

If he meant to say that those bonds were then pledged for the floating debt, or that there was a declaration of trust by the company that they should be held by him as a security for the floating debt, whereby a right had vested in the owners of the floating debt to have them applied to its payment, he was manifestly mistaken; for no such trust had been created by the resolution of the executive committee. And if that resolution had vested in him the power to apply or pledge those bonds to that purpose, he evidently had not executed the power. He had given no

pledge that they should be so applied. When he says that he holds them as collateral for the payment of that debt, he could only have meant that he was invested with power so to apply them, if he deemed it expedient, and therefore could consent to the release, so far as they were concerned; not that he had already executed the power, or by any act of his had vested a right in the owners of the floating debt, to claim the said bonds as security for their debts.

If such a trust had been created, and right vested in the owners of the floating debt, it would not have been competent for him to have consented to the release of the machinery without the consent of the owners of that debt. To have done so, would have been a breach of trust on his part that would have defeated the very object he had in view, viz: to give authority to the trustees to release, and to relieve them from liability for so doing.

And if he meant that he had pledged those bonds to the owners of the floating debt, and that a trust had been created for their application in that way, it would have been a flagrant violation of the condition upon which the Bank of Tolland and A. P. Hyde had agreed to consent to the release, and in fact a gross fraud upon them, the imputation of which the character of Mr. Kent would repel.

It is evident that it was not the understanding of Mr. Kent himself that he held those bonds under the resolution of the executive committee, in trust for the benefit of the owners of the floating debt, and that they had been issued and delivered to him by the company with such a declaration of trust. All the bonds were in his custody, as president of the company, and in his annual report of 1868 he reports that he had used only $15,500 of the bonds, and that "the residue of the bonds, amounting to $14,500, are still in the hands of the company." And in his annual report of April, 1869, he states the amount of bonds issued to be $15,500. Afterwards, in the same year, four thousand

five hundred dollars more were issued, which he sold to Hyde, leaving only $10,000 of the bonds in the hands of the company.   These statements were deliberately made by him after the resolution was passed, which is claimed to have created a trust in him, as to those bonds, for the benefit of the floating debt.

If no such trust existed under the resolutions aforesaid when those statements were made, which it is evident could not have existed, it is clear that such a trust could not have existed under said resolutions when he signed the request and authority to the trustees aforesaid.   And he could not have meant that by what he underwrites to his signature.

That he did not is further shown by the fact that he never annexed the seal of the company to those bonds, which was necessary to their completion, and that the coupons to them were not perfected; and still further, by the fact that he inclosed those bonds in an envelop, on which he endorsed the numbers of the bonds and the words " unused " or " unexecuted," and placed them in the safe of J. H. Montague.   And this conclusion is further supported by the fact that there is nothing in the reports of the president, or upon the records of the company, to show that those bonds had been issued, and that neither of the members of the executive committee ever knew or heard of their being issued; and that the appellants, through a long lapse of years, never made any claim to them, and not until after the sale to Freedley; and that there is nothing in the archives or records of either of them, both being banking institutions, to show that they had ever received any pledge or promise from James L. Kent, that he held them as collateral security for their debts.   And in addition, what consideration was there to induce the Bank of Tolland and Hyde to release so valuable a part of their security, except

the assurance, which they allege was given them, that their bonds were all that had been issued, and that the remaining $10,000 should never be issued, so that they would be entitled exclusively to the remaining security of the deed of trust? And the property released being worth $20,000, it was very natural that the bank should have required a guaranty for the excess of the $20,000 of security released, over the $10,000 of bonds which were not to be issued. The result has shown that the real estate, which was the only security remaining under the deed of trust, was very inadequate, contrary, doubtless, to the honest belief of James L. Kent at the time he proposed the release of the machinery, in consequence of great damage to the property by the two extraordinary floods of 1870 and 1877, which could not then have been foreseen or apprehended, but it shows that it was judicious and a wise providence in the bank to require a guaranty of a part of its debt, as an additional security to the real estate, in consideration of its consenting to the release of $20,000 value of its original security. But it shows that Mr. Hyde, by consenting to the release of a part of his security, and by uniting with his brother-in-law, James L. Kent, in the guaranty to the bank has lost the whole of his debt, and is liable to make up to the bank what the real estate has proved to be deficient as security for its debt.

We think that there is no error in the decree of the chancellor in holding that the entire net proceeds of the sale of the real estate was liable for the $20,000 of bonds held by the Savings Bank of Tolland and Alvin P. Hyde, if said sale was valid.

Said sale was made by the trustees upon the written request of the parties, who claimed to hold all the bonds which were issued by the company, and secured by the deed of trust. The deed requires the trustees to advertise

and sell the property after default in payment, upon request by the holders *bona fide* entitled to the larger amount; that is, more than one-half of all the debt secured by the deed.

The parties at whose request the sale was made, were the *bona fide* holders and owners of two-thirds of all the bonds that the company was *authorized* to issue; and the trustees in making sale at their request, were acting in obedience to the requirement of the deed. They were not bound to postpone or defer the sale, until the rights claimed by the appellants were determined, because they had no knowledge of the existence of any such claim, and no objection was made to the sale by any one, and they were not aware of any objection, or that any one disputed the rights claimed by the parties at whose request the sale was made, or that there were any matters to be litigated to determine the rights of any one in relation to the property which they were required to sell. It would seem, therefore, that in proceeding with the sale they only did what a faithful execution of their trust required.

After the sale was made to Freedley, they were for the first time informed that there were any difficulties in the way of its consummation, and that the appellants might set up claims to share in the security, and they at once filed their bill in this case to remove any difficulties, and to have any questions that might be raised determined. That would seem to be all that they could have done, and as *soon* as it could have been done. And the claims of the parties at whose request the sale was made being determined in their favor, and it appearing that the property sold at its fair value, and would not likely bring more if there should be a resale, and that the change made by the trustees in the terms of sale, on time instead of cash, by the direction of the parties at whose request the sale was made, which was without prejudice to the appellants, and

with the acquiescence of the company, the grantor in the deed, who does not object, we are of opinion that said sale was valid, and ought not now to be disturbed; but should be confirmed. Upon the whole, we are of opinion that there is no error in the decree of the chancery court, and that the same be affirmed.

DECREE AFFIRMED.